UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 18-CR-20682-ALTONAGA

UNITED STATES OF AMERICA

v.

MATTHIAS KRULL

Defendant.

## FACTUAL PROFFER

The United States of America and Matthias KRULL stipulate that if this matter were to proceed to trial, the Government would prove the stated facts beyond a reasonable doubt:

### Introduction

1. From December 2014 through July 2018, KRULL, along with Francisco Convit Guruceaga, Jose Vincente Amparan Croquer, a.k.a. "Chente," Carmelo Antonio Urdaneta Aqui, Abraham Edgardo Ortega, Gustavo Adolfo Hernandez Frieri, Marcelo Federico Gutierrez Acosta Y Lara, and Mario Enrique Bonilla Vallera and others, conspired to engage in monetary transactions, conceal, disguise, and otherwise launder hundreds of millions of U.S. dollars' worth of funds, which they believed and which in fact were the proceeds of criminal activity (that is, foreign bribery and violations of the Foreign Corrupt Practices Act (FCPA)), including transactions with "U.S. Financial Institution 1," an FDIC insured bank and "financial institution," as defined in Title 18, United States Code, Section 1956(c)(6)(A), in violation of Title 18, United States Code, Section Sections 1956(h) and 1957.

2.      In addition, KRULL and others traveled in and used facilities of interstate and foreign commerce to manage and promote both their money laundering activities and violations of the Bank Secrecy Act, Title 31, United States Code, Section 5322.

### Background: Corrupt Currency Exchange Schemes

3.      At all relevant times, Venezuela had a foreign-currency exchange system under which the government will exchange local currency (Bolivars) at a fixed rate for U.S. Dollars. The fixed exchange rate has been well below the true economic rate by a substantial factor for several years.

4.      For example, in 2014, an individual could exchange 10 million U.S. Dollars for 600 million Bolivars at the true economic rate. Then, if that individual had access to the government fixed rate, he could convert that same 600 million Bolivars into 100 million U.S. Dollars. Essentially, in two transactions, that person could buy 100 million U.S. Dollars for 10 million U.S. Dollars.

5.      The difference between the fixed rate and the true economic rate creates opportunity for fraud and abuse, where Venezuelan officials engage in these foreign currency exchange schemes in return for bribes and kickbacks.

6.      These corrupt foreign currency exchange schemes occur in significant amount within Venezuelan state-owned oil company, Petróleos de Venezuela, S.A. (PDVSA). PDVSA is Venezuela's primary source of income and foreign currency (namely, U.S. Dollars and Euros), and serves as the source of foreign currency used to fund corrupt foreign exchange embezzlement schemes.

7. In this case, as set forth in more detail below, KRULL and others conspired to launder and engage in monetary transactions with the proceeds of a corrupt currency exchange scheme with PDVSA.

**Background: False-Investment Money Laundering**

8. KRULL and other members of the conspiracy are sophisticated operators with respect to the international banking system and are aware of banks' general due diligence and anti-money laundering practices, including know-your-customer (KYC) requirements.

9. Importantly, for one party to wire funds to a third party, there must be some legitimate business justification provided to the bank; for instance, a payment for the purchase of real estate or equipment. Moreover, a bank will ask for documents supporting the justification, which—depending on the transaction—can be difficult to manufacture; for instance, a bank may be able to verify whether a supposed real estate transaction took place. This verification poses a problem for money laundering transactions in which large sums of criminal proceeds must be moved around the financial system from one person to another as bribes, kickbacks, transfers, or exorbitant expenditures, for instance.

10. Accordingly, false investments in fake securities are convenient justifications in that they are more difficult for a bank to investigate and verify. By way of example, one party might wire 30 million U.S. Dollars to a third party with the justification that the amount is a loan to the third party, supported by a 30 million U.S. Dollar promissory note due at some point in the future, which neither party actually intends to honor. For the bank, ascertaining the true intent of the parties and the fraudulent nature of the investment is difficult.

11. Sophisticated false-investment money laundering schemes are used throughout this conspiracy, ranging from individual false securities (promissory notes and bonds) to entire false-investment funds, which can be subscribed to as needed to justify transactions.

12. Surrounding and supporting these false-investment laundering schemes are complicit money managers, brokerage firms, banks, and real estate investment firms in the United States and elsewhere, operating as a network of professional money launderers.

### Corrupt PDVSA Exchange Scheme

13. The purposes of the money laundering conspiracy in this case was to launder $1.2 billion U.S. Dollars' worth of funds embezzled from PDVSA by Venezuelan officials, including by "Venezuelan Official 1," who was a "foreign official" as that term is defined in the FCPA, and who authorized the embezzlement in exchange for kickbacks.

14. The embezzlement operated by way of a PDVSA foreign-currency exchange scheme benefitting Eaton Global. The exchange scheme was disguised as a "financing" arrangement using the following three documents in an artless attempt to hide the embezzlement:

   a. First, a <u>loan contract</u>, dated December 17, 2014, between PDVSA and Rantor Capital C.A., a Venezuelan shell company, in which Rantor agreed to loan 7.2 billion Bolivars to PDVSA. The loan contract was executed by "Venezuelan Official 1" as Vice President of PDVSA;

   b. Second, an <u>assignment contract</u>, dated December 23, 2014, between Rantor and Eaton Global, in which Rantor assigns its rights as PDVSA's creditor under the loan contract to Eaton Global and in which it is contemplated that PDVSA is given the right to cancel the debt within 180 days by paying 600 million U.S. Dollars; and

      c.     Third, a <u>notice of assignment letter</u>, dated December 23, 2014, in which Eaton Global informs PDVSA (*i.e.*, Venezuelan Official 1) of the assignment and suggests that PDVSA repay the 7.2 billion Bolivar loan in the Euro equivalent of 600 million U.S. Dollars.

15.    In short, Eaton Global, which was controlled by members of the conspiracy, received about 511 million Euros from PDVSA after loaning PDVSA about 7.2 billion Bolivars (worth around 35 million Euros) for no more than a few months.

16.    Venezuelan Official 1, and others, facilitated this scheme in exchange for receiving kickbacks from the proceeds. This bribery of Venezuelan Official 1 violated not only Venezuelan law, but also the Foreign Corrupt Practices Act because one or more members of the conspiracy engaged in corrupt acts from within the territory of the United States. At all relevant times:

      a.     Embezzlement of public funds by a public official and bribery of a public official was an offense against the nation of Venezuela, under more than one provision of Venezuelan law.

      b.     The corrupt use of facilities of interstate commerce or any other act, while in the territory of the United States, to further a payment or promise of a payment to a foreign official for the purpose of influencing or inducing that official to act, was a felony violation of the Foreign Corrupt Practices Act.

17.    Accordingly, the proceeds of the PDVSA foreign-exchange embezzlement scheme paid to Eaton Global are the proceeds of specified unlawful activity as defined in Title 18, United States Code, Section 1956(c)(7).

18. The members of the conspiracy agreed to split the net proceeds of the PDVSA foreign-exchange embezzlement scheme as follows:

    a. 227 million Euros went to the "Boli" (Francisco Convit Guruceaga and "Conspirator 2"); and

    b. 227 million Euros went to "Conspirator 7"

19. From there, the members of the conspiracy agreed to further distribute the proceeds among some of the members of the conspiracy, for instance:

    a. The "Boli" routed approximately 78 million Euros to a confidential source (CS), who was instructed to deliver the funds to Carmelo Urdaneta Aqui, Abraham Ortega, "Conspirators 1 and 3," and Venezuelan Official 1; and

    b. "Conspirator 7" routed approximately 159 million Euros to three individuals known as "Los Chamos," the stepsons of "Venezuelan Official 2," who was a "foreign official" as that term is defined in the FCPA.

20. In order to conceal the nature, source and control of the PDVSA funds, the members of the conspiracy included an array of straw owners, bankers, money managers whose role was to facilitate the laundering.

### KRULL's Role in the Conspiracy to Launder the PDVSA Funds

21. KRULL's role in this conspiracy was as a banker and money laundering facilitator for "Conspirator 7" and others.

22. Until approximately May of 2018, KRULL was employed at a Swiss bank where he was a Managing Director and Vice Chairman. KRULL's role was attracting private banking clients to the bank, primarily from Venezuela.

23. In this role as a "door opener," KRULL counted as private banking clients: Francisco Convit Guruceaga, and Conspirators 2, 7 and 9, dating back several years.

24. In or around 2016, Conspirator 7 contacted KRULL about laundering the proceeds of the PDVSA foreign exchange embezzlement scheme.

25. Initially, Conspirator 7 informed KRULL about a tranche of money worth about 600 million U.S. Dollars generated from foreign exchange contracts. Conspirator 7 stated he needed a solution for moving and depositing the funds. KRULL asked Conspirator 7 for the source of the funds, and Conspirator 7 provided KRULL a copy of an addendum to the original PDVSA and Rantor loan contact, which doubled the initial credit line from 7.2 to 14 billion Bolivars. The amendment was dated May 25, 2015 and specifically incorporated the initial PDVSA loan contract.

26. Conspirator 7 later summoned KRULL to his office in Venezuela regarding a tranche of money worth about 200 million U.S. Dollars. Conspirator 7 stated that he needed an urgent solution for moving these funds, and that he wanted KRULL to meet the owner of the funds.

27. At Conspirator's 7 office, Conspirator 7 introduced KRULL to Mario Enrique Bonilla Vallera (formerly referred to as "Conspirator 8") and "Conspirator 10," both as the people who Conspirator 7 "represents."

28. Conspirator 7, in turn, asked KRULL if KRULL knew who "Mario" represents. When KRULL answered "no," Conspirator 7 explained that "Mario" represents "Los Chamos" (the stepsons of Venezuelan Official 2). Conspirator 7 explained to KRULL how "Los Chamos" help Conspirator 7 solve issues with Venezuelan Official 2, by intervening with their mother, the wife of Venezuelan Official 2.

29. Conspirator 7 then introduced KRULL to "Los Chamos" who were seated in the next room, with Conspirator 9 and "Conspirator 11," wearing hats and chains. It was explained to KRULL that Mario Enrique Bonilla Vallera and Conspirator 10 would be the straw account owners for "Los Chamos," for whatever solution KRULL provided.

30. Conspirator 7 explained to KRULL that he (Conspirator 7) was displeased with the previous efforts of Jose Vincente Amparan Croquer and the "Portuguese guy" (Hugo Gois) to manage the money. KRULL agreed to assist and join the conspiracy to launder the funds.

31. KRULL met with Mario Enrique Bonilla Vallera and Conspirator 10 on several occasions in an effort to assist them in receiving the PDVSA funds as straw owners for the "Chamos," including as part of a proposed plan to use a money laundering structure with Global Securities Advisors and Gustavo Hernandez Frieri in Miami, Florida which included deposits to be made to U.S. Financial Institution 1.

32. KRULL and Conspirator 7 had additional meetings, including one on Fisher Island in the Southern District of Florida, where Conspirator 7 was renovating a condominium. During that meeting, Conspirator 7 called Conspirator 11 to inquire as to the status of providing KRULL with the necessary documents to move the funds for the "Los Chamos."

33. KRULL was specifically aware that Conspirator 7 was previously involved in another corruption scheme involving a high-level Venezuelan official from Conspirator 7's own past statements to KRULL.

34. KRULL knew that he was participating in an illegal money laundering conspiracy and that the funds he was attempting to conceal and transact in were the proceeds of criminal activity and bribery in particular.

BENJAMIN G. GREENBERG
UNITED STATES ATTORNEY

Date: 8/22/18

By: _____
FRANCISCO R. MADERAL
MICHAEL B. NADLER
ASSISTANT UNITED STATES ATTORNEYS

SANDRA L. MOSER
ACTING CHIEF, FRAUD SECTION
U.S. Department of Justice, Criminal Division

Date: 8/22/18

By: _____
DAVID S. JOHNSON
ASSISTANT CHIEF
GWENDOLYN A. STAMPER
TRIAL ATTORNEY

Date: 8/22/18

_____
OSCAR SANTIAGO RODRIGUEZ
ATTORNEY FOR DEFENDANT

Date: 8/22/18

_____
MATTHIAS KRULL
DEFENDANT